And turn to our next case for this morning, which is the United States of America v. Brooks. Are we ready to go? Yes, I am, Your Honor. Go right ahead. Mr. Clue? No, this is Mr. Burstein. I represent Victoria Brooks, Andrew Brooks, and Elizabeth Brooks. This is the bail part of the appeal. Ms. Harris is also representing Terry Brooks. We've divided it up so that Ms. Harris is going to deal with the fact-finding in the court below and the application of the Gambino factors primarily. I want to deal with really two issues. The primary one is the impact of the invalid S-1 indictment, and I know Your Honor was on the Hatfield panel. This case is fundamentally different. There's no dispute that the first indictment was not an appropriate indictment, was not a valid charging instrument. I understand the Hatfield ruling is consistent with law, that that's the kind of problem that can be cured by a pettit jury's verdict. That's not what you have here, because what you have here is a situation where you start off with the fact that there was, in contrast to the normal indictment situation. But the decision in Hatfield was not just based on it was cured by a verdict, though, was it? No, it was also on this jurisdictional issue that the fact that there had been the court retained sort of jurisdiction over the crime. But here's the key difference. Congress has spoken on the issue of a district court's or a magistrate judge's jurisdiction to set bail. 3142 says that bail can only be set for a person charged with an offense. Mr. Brooks was not charged with an offense. To give an example of when the Hatfield reasoning might make sense, if Mr. Brooks had been arrested on a complaint and bail had been set, then the Hatfield analysis would arguably make sense. But that's not what happened here. The docket shows he was arrested on an indictment and he was released on bail on an indictment. What does that mean? What conclusion do you want us to draw from that, that the judge couldn't set bail at all? Two points. One is that the judge couldn't set bail at all because he wasn't charged with an offense. Secondarily, which is related to that. That doesn't make any sense to me, because there was a second indictment. So you're saying the judge had no power to set bail on the second indictment? No. I do believe the judge had power to set bail on the second indictment. So what's the practical effect of all of this? The practical effect of this is that one of the fundamental precepts of surety law is if there's a change in the underlying obligation. You're saying that they would never have agreed to be the surety on the second indictment. I'm saying that's not my burden. I think it's the government's burden, because if what we really have here is a situation where the government got the benefit of getting a superseding indictment without first revealing that there had been an invalid initial indictment, because the law is clear and we've cited it, that if, in fact, you have an invalid indictment, it has to be dismissed. Bail is automatically exonerated. Here, the record is crystal clear that the sureties were never brought back in and said sign a new bond. Here's what you face. So that's my answer. And I only have about a couple of seconds, so I'm going to say one other thing. You don't have any seconds left. Would you like to take some more time? Elizabeth Brooks. Go ahead. I'll give you some more time. Okay. Thank you. The only other point I wanted to make is that with respect to Elizabeth Brooks, who was 13 years at the time of the bail bond and who was not a surety, the notion that almost $4 million of hers should not be remitted is really, if we're talking about interests of justice, profoundly disturbing. Whatever the district court's finding, we believe it was erroneous. The fact of the matter is there's no allegation Elizabeth Brooks did anything, could have done anything. Just remind me why it's her money. She had an interest in a company called Perfect World Partners. Who put it up? Who put up her money then?  Her mother. Her mother. But nonetheless, it's her money, and she shouldn't have to suffer for something that, A, I don't think there should be forfeiture, but even if there should, she, as a 13-year-old who was not a surety, should not have to suffer under those circumstances. Recognizing I have so little time, thank you. We have some time reserved to you. Yes. We'll see you in a second. And Ms. Harris, you next? Yes. Good morning. May it please the Court. Justine Harris. I represent Terry Brooks, the ex-wife of David Brooks. And as Mr. Burstein indicated, I'm going to address the clearly erroneous factual findings in the district court below. Throughout the opinion below, the district court focused on the alleged involvement of Terry Brooks and the three Brooks children, Victoria, Andrew, and Elizabeth Brooks, in the allegations relating to the so-called Sears and Ecott scheme. The only record evidence relating to these issues is the affidavit of Special Agent Angela Jett. And there is nothing in that affidavit that links any of the appellants, the mother and the three children, to anything related to Sears and Ecott. First, with respect to Terry Brooks. Weren't their passports used? Or am I getting that confused with the Swiss bank accounts? Your Honor, with respect to the children, the only allegation is that copies of their passports were used by their father in order to open up accounts. I don't think under any scenario can we assume that that opening of the accounts using copies of passports establishes any knowing involvement by the three children, especially given that one of them was only 13 or 14 years old at the time. What about the video? The video of the safe lane deposit boxes. Your Honor, first of all, that safe deposit box that supposedly Terry and Victoria Brooks emptied is a safe deposit box that has nothing to do with the safe deposit box. No. Your Honor, in fact, that conduct, if it's established. I agree that the proffer of the video shows not only David Brooks, Jeffrey Brooks, but your clients in London removing money from that safe deposit box. There's a proffer. We have still photos of Mr. Brooks there doing it. But then at the second day of the hearing, there's a proffer by the government saying, we have a video of these other people involved with him taking money out of that safe deposit. Did you say that they don't have that video? Two things, Your Honor. One is that video and photograph is not part of the record evidence. But secondly. There's a proffer. There's a proffer. The proffer, as I understand it, and I think the citation is to Government Appendix 04. The proffer by Assistant United States Attorney Ott at the time says specifically that in November 2007, so at an entirely different time, that Victoria and Terry Brooks were seen on closed circuit television emptying box. A couple of days. No. No, Your Honor. Emptying box 6068, which is an entirely different safe deposit box. 6070 is a safe deposit box that years later they're found to be the euros and the British pounds. In fact, as we indicated in our reply brief, Terry Brooks and her youngest daughter lived in London from 2006 to 2007. So the fact that they had a safe deposit box, there's nothing nefarious about that. And moreover, this is the time period when pursuant to the terms of the bail release order, they're supposed to be repatriating non-liquid assets and returning them to the United States. So that's what they were doing? Your Honor, we haven't had an opportunity to have a factual hearing about any of this. But there's nothing. I mean, that's the inference. Let's go to the jet affidavit. It's paragraph 30 on Appendix 338. It says that the still photos of Jeffrey Brooks emptying that London safe deposit box were November 14, 2007. Right? You've got the jet affidavit, right? Yes, I do, Your Honor. And then the proffer I have says the government submits by proffer on that same date, November 14, 2007, both Victoria and Terry Brooks are on video emptying out the safe deposit box. How is that a different date? Your Honor, I apologize. I don't know whether the video, and I've not seen the video in connection with this. It's not part of the record evidence. That's a different argument than saying it's a different date. That was your argument, right? No, Your Honor, and I misspoke. I understood the issue with the circumstances are that this John Doe No. 1 took materials from one safe deposit box and placed it in the box that was later found to contain cash. No, what happened was John Doe 1, the next day, opened up another safe deposit box and put the money that was taken the day before from that safe deposit box into a new one. Correct, but it has nothing to do with the safe deposit box that's associated with Terry Brooks and Victoria Brooks, Your Honor. There's no link between, because it's the... How's that? Because the information is that the material was taken from a safe deposit box associated with Jeffrey Brooks and placed in safe deposit box 6070. The information, there's no allegation that the safe deposit box is associated with Terry Brooks and Victoria Brooks, which is 6068, that any of the materials taken from that safe deposit box ended up in the safe deposit box with the assets. How about the stationary found in the safe deposit box from John Doe the next day that had Jeffrey Brooks' stationary? It was Jeffrey Brooks' stationary and other evidence that it was the same. Your Honor, I am not, we don't represent Jeffrey Brooks. Jeffrey Brooks is not an appellant here. He's not seeking any of these assets. These are assets that he's renounced to the extent there was any interest. He's renounced any interest in them. These are assets that belong to the mother, to Terry Brooks, and the three children. You're asking us to find that Judge Seibert abused her discretion when she had all these facts in front of her. I mean, maybe it was just a really, a series of unfortunate coincidences, but she's making a determination about bail forfeiture based on the circumstances in front of her. Those are pretty, that's pretty powerful evidence. Your Honor, first, the only finding that Judge Seibert made with respect to our clients, the appellants, was their alleged involvement in Sears-Nicot, and she cited that repeatedly throughout the decision as a basis to discount the Gambino factors and substantially weight against them. As to that issue, Terry Brooks' name is not mentioned once in the JET affidavit. There's nothing associating Terry Brooks with any of the Sears-Nicot accounts. The other alternative basis— What about the trip to Switzerland? The trip to Switzerland, Your Honor, also, I urge— The pilot said that she and other family members were carrying bags, and they went right to a bank. Your Honor, that— Wasn't that a prof or two? That also, that is conduct that supposedly took place in July 2006, so a full year before indictment. Again, totally unrelated to the bail release order. And I urge the Court, and Your Honor, to look specifically at the JET affidavit, because it's very interesting. The JET affidavit actually says—this is at A345—that the assets were repatriated from Switzerland, that there is evidence that assets were repatriated from Switzerland. And, in fact, this pilot testimony, Your Honor, was in 2007 before indictment, so it was known to the government before Mr. Brooks was released, and at the time of release— I'm sure that Mr. Brooks knew that the investigation was going on and that the walls were closing in on him, right, at that time. I mean, it wasn't like the day they returned the indictment was, I didn't know this was happening. No, Your Honor, the question— Two defendants had already been indicted, right? Hatfield and another defendant had already been indicted. And, again, we're not here defending the actions of David Brooks, Your Honor. What we're here to do is say, did the appellants, Terry Brooks and the children, have any complicity in the alleged bail violations? And the fact of the matter is, when you look closely at the jet affidavit, there's no evidence whatsoever that there were any assets overseas in safe deposit boxes in Switzerland. So those are all back in the U.S.? The government's own representations are that the assets were repatriated. They know about Villalon's testimony at the time that Mr. Brooks was released. They represent an open court to the judge that the money went— they're comfortable and they're satisfied because they believe it's been returned to the United States. Those are the representations they make, and nothing that Agent Jett's investigation finds thereafter establishes that those representations are not true. If we look closely at the affidavit that she submits, she says that her confidential source had a conversation with Jeffrey Brooks in 2007 and that he was talking about intending to open additional boxes. In fact, and the affidavit says it specifically, it's really worth— it says specifically that it's not ever confirmed that those steps were taken. So it's reporting on a hearsay conversation that allegedly took place between Jeffrey Brooks and a confidential source about Jeffrey Brooks opening additional safe deposit boxes. The affidavit concedes that assets were repatriated from Switzerland, but there's no allegation that those boxes were ever opened, and certainly no allegation that there were assets hidden overseas in such boxes that our clients, the children, and Terry Brooks had any understanding of. So the question is, were there—with respect to Terry Brooks and the children, we do—the findings of fact were in the—found no support in the record, and that this—and because it played such a substantial role in the court's determination in refusing to remit at least—set aside a portion of the bond forfeiture under pursuant to Rule 46F2, which says that she has the authority to do so so long as justice does not require. This is a $17.7 million forfeiture on— Out of what, $400 million that was— The cash security, Your Honor, was initially $45 million. $22.5 million had been previously released back to David Brooks. Even following forfeiture—so the amount forfeited was $22.5, I think, roughly, million dollars. Even following the forfeiture, Judge Seibert on her own released an additional $3 million to the defendant to pay for legal fees and taxes and other costs. So the remaining amount forfeited was $19.5 million, and then we were seeking to set aside, Your Honor, $17.7, which belongs to the children and to Terry Brooks. Thank you, Ms. Hirsch. You've got a few minutes also reserved. Thank you very much. Is Mr. Clue now who's up? Is that right? Yes, Your Honor. Okay. There are several points that are undisputed in this case. First, we know the law of the land from the Supreme Court. It's not optional. You're talking about the restitution part, right? Is that right? I'm talking about the abatement doctrine.  The abatement doctrine. As it might apply to restitution, right? Yes. I think that is— It doesn't apply to bail, though, does it? The abatement doctrine, there's not been a decision about it. This is the first case in which the government has sought to challenge that type of penalty for being abated. So there may be—and every other time, there's never been any occurrence where someone has had to come before a court of appeals and argue for this abatement. It's a penalty. They don't dispute it. It's called forfeiture. There's no question about it. This Court in Giganti referred to it as a sanction. We're talking about bail now. Bail. It's a penalty. It's a sanction. It's essentially a contempt sanction. How long ago did it happen before the conviction? Six years? Did what happen? I'm sorry? The bail forfeiture. The bail forfeiture did not become final until the judgment was entered, and that's under Giganti. While the release, which is not a sanction—custody or release is not a sanction. Forfeiture is a sanction. Release is immediately appealable. It's not part of the criminal penalty. It's not part of any criminal penalty. The bail forfeiture becomes appealable only at finality of the judgment. But the decision was in January 2010. The decision—the initial decision, again, as Giganti explains, when you're talking about bail forfeiture, you don't go by the initial decision. Otherwise, that might be interlocutorily appealable as well. You go by the post-remission rulings and the finality. When you're a criminal case, you get the finality from the judgment. That was 2015. That brings me to another point about the government continuing to say there's delay in this case. The delay is ironic. We raised the speedy trial issue. We demanded speedy trial rights. That's the delay that—if anybody's going to complain about it. Can we just get—I mean, a bail proceeding is entirely separate from a determination about guilt or innocence. Absolutely. So a bail proceeding is the defendant's promise to the court to return and to abide by conditions. And I'm sure you don't dispute that the judge was permitted to set these conditions, that the defendant revealed the location of his assets and all of those things. He violated the terms of that, and he paid the sanction for it, which was bail forfeiture. That has nothing to do with guilt or innocence. That has to do with obeying the court's directives on the conditions that he would be released. Under the abatement doctrine, it certainly is a penalty that is part of the criminal proceeding. So we know that the government's argument initially was compensatory versus non-compensatory damages. This is non-compensatory. This is punitive. So the abatement doctrine, which goes beyond mere criminal cases, the abatement doctrine applies to all sorts of governmental activities that enforce punitive penalties, first of all. But it is still part of the criminal case, in answer to your question. If it were not, under your question, it still would abate. It doesn't matter what you call it. But the point is, it's part of the criminal process. And as I was beginning, the Supreme Court, this is now 46 years ago, said abatement ab initio, all proceedings abate. All proceedings abate ab initio. This is one of those proceedings. And the derivative effects of that abated proceeding includes the forfeiture as to the children. Could I ask you to address the restitution aspect of your abatement argument, then? Why should it apply to restitution? That's a big question, right? Well, the Supreme Court clearly rejected both the equity arguments and the penalty, non-penalty arguments in Nelson. The Supreme Court said, came up with a new way to define it, which is it is a financial exaction. It is a financial exaction as a result of a criminal judgment. And that's the term that we have used. That's the term that even the dissenting opinion used in reaching exactly the same conclusion that we have reached. I think there's really basically, it's essentially unanimous in the Supreme Court. But even if you look to the dissent, they still say, when you're talking about restitution that's not yet been paid, it abates. No question about it. And that is to all of them. Every single conviction was at issue in this case. Every single conviction. The government tries to carve out tax convictions. They were at issue. We spent 40 pages of our brief attacking those convictions. They have conceded that the tax convictions must abate. With that abatement comes the restitution, the forfeiture, the bail forfeiture, everything else ab initio. That's the law. Would you get the restitution back if you had already paid it? Under Nelson we would. But we didn't need to reach that point. Let's say that the restitution got paid to the victim before all of this happened. Would you be able to claw it back from the person to whom it was paid? I think the answer is no. Well, under Nelson I think the answer. But Nelson, if I'm thinking of the Colorado case, right? Nelson is the Colorado case. The child rape case. Okay. But there was a determination on the merits, right? No, there was no. The case was reversed. No, a final determination on the merits as to Madden. There was a determination on the merits as to Nelson as to Madden. No, there was just a decision to. Not to prosecute. The prosecution abated its further prosecution. Not to prosecute. That's right. There was no final. That's not what happened here. No, but what happened here, as the Supreme Court said in Nelson, is whatever the reason, in footnote 10, whatever the reason for the invalidation. And, I mean, they didn't have to go that way. They're trying to settle the law here. They're trying to eliminate these arguments so that we don't continue to waste judicial resources on them. Whatever the reason for the invalidation, it abates ab initio completely. And it's a fundamental problem. Did I hear you to say that the government concedes that the tax counts restitution should be abated as well? No, they concede that the convictions on the tax counts must abate. Even with an appeals waiver on those counts? Well, there was not an appeal. Because there was a plea and appeals waiver, right? Well, the two cases in which they cited, the one case they cite on guilty plea is asset. And that did permit the abatement on a guilty plea. I'm just asking if that occurred here. There was a guilty plea after the verdict to the tax counts by Mr. Brooks, and the plea agreement had an appeals waiver in it. Yes. Under those circumstances, does restitution associated with the tax counts conviction, does that abate and why? Well, for the same reason that they agree that the tax convictions themselves abate. First of all, the rule doesn't change because of the history of the case. The tax convictions abate for the reason, one reason is 40 pages of our brief attacks the indictment on the tax counts. But he took a plea and he waived the right to appeal. I understand that. Then we discovered the S-1 problem. Let me finish my question. He took a plea. He waived his right to appeal. So one of the concerns about with abatement we don't have because he waived the right to appellate review of his plea. Well, the court would be creating a circuit split if it goes that way. But you don't need to go that way in this case. Because the difference in this case is they're twofold. First of all, apart from their concession that it must abate, the conviction must abate. So that really they've conceded away from that. So I shouldn't have to argue that point. Sorry. I appreciate it. I just want to finish my question. I appreciate it. No, it's the nature of the thing. And what you have then is to look at what happened. You have a guilty plea that is linked to a requirement that the sentence be concurrent to another valid sentence. In other words, if there's no sentence imposed on the other one, there's no sentence here and the guilty plea is no good. But you don't have to even go to the guilty plea agreement to show that it doesn't hold up any longer. Because after the plea is entered, we learn the S-1 defect and we move to dismiss the entire indictment. And the government has never contested our right to challenge the dismissal of the entire indictment, including the tax counts. And that's why 40 pages, the first two issues of our brief, is about dismissal of the entire indictment. So that the notion that the guilty plea, even if the court were to try to create a circuit split with the D.C. Circuit and the Fifth Circuit, including the case they cited, Asset, it still must be abated. Ab initio, everything. Thank you. Thank you, Mr. Kluge. You've got some time, too, left over. So we'll hear from the government. May it please the Court, my name is David Kessler. I'm an assistant U.S. attorney in the Eastern District of New York. And I will address all of the arguments except the restitution argument that was just discussed. My colleague, Laura Mantel, will address that. So the first argument we heard about was the S-1, S-2 issue. So I have three responses to that. First, the issue wasn't preserved. We've argued that. It's evident by, among other things, the fact that 18 U.S.C. 3142, which is the statute that the appellants just relied on, is not cited in any of their briefs or referred to. Second thing is that there's no dispute that the bond conditions that were ultimately enforced in 2010 were the same ones in relevant respects that were imposed under the S-1 indictment and that the court continued them to S-2. The appellants have argued that they were somehow not aware that those conditions continued or would not have agreed to them. They were clearly aware. They've never asserted surprise before the district court. In 2015, five years later, when they moved to get their money back, they never said, oh, we didn't know there was a bond. We thought it had not been. The argument that it seems to be unfair that, at least as to the daughter, I think was 13 at the time, gee, I mean, how can you hold her responsible? Why shouldn't she get to keep part of the $17.7 million? How is that fair? Well, so, first of all, fairness to the sureties is explicitly not a consideration. We've argued that in our brief. That's the Carvajal case, which is an Eastern District one, which was relied on by the circuit in Gambino in laying out this test. Second of all, you have a child whose mother put up property in which the child had some interest. There's nothing improper about that at the time it happened. It may be at some level unfair. Certainly, I don't think Elizabeth Brooks, there's a suggestion, was as involved as the rest of the family, which I'll get to. But that's not the question here. This isn't a punishment to the family. That's the point of Gambino. The bail forfeiture has a number of other operations, and that's what's going on here. So, I'll turn to the other issues. I'll just point out that even in the record, if the court goes through the docket entries in the 400s and 500s, there are various letters that involve the family and Mr. Brooks that were put in place after the S2 indictment went on. So, I think there's no possible argument that they didn't know this bond had continued. They never objected to being on the bond. That argument should go away. All right. So, the second argument was this potentially erroneous finding of fact about the family involvement. So, let me say two things. First of all, let me very briefly point out the evidence of involvement, which I think may be a little bit different than culpability, and then let me address what the court actually held because I think the district court's decision is being a little bit overread by the appellants. So, the record included the fact that, as the JET affidavit, other family members met with CS1 other than Jeffrey Brooks. Some of the Brooks family, I'm blanking on the names, but this is A334, their passports were used in establishing the CERNICOT. The children were the beneficiaries of CERNICOT. There's the safe deposit box issue, which we discussed, so that two of the appellants are on video unloading, I think it's safety deposit box 6068, when the next day someone else loads 6070 in the same bank with all of these assets. And then there's the discussions about the plane to Switzerland. Let me just say on that point, the JET affidavit, which appellants cited, is completely clear that this is A345, the page they cited. Some of the assets may have come back. It is unknown whether some of the transfers occurred. None of the transfers involved the transfer of assets from Swiss safety deposit boxes, and certainly the government never represented that it was certain all of the assets had been returned. That's the point of concealing assets. So, there's certainly strong record evidence of involvement by the family. And I think to the extent the appellants are resting their argument on the idea that the district court somehow based its entire decision, which is certainly considered all the other factors, including deterrence and cost, but to the extent the family involvement played any role, here's what the district court actually said. The district court, it refers a couple times to the movements participating or being involved. But what the court actually says when it gets down to the Gambino factor that it really considers, movements do not offer any explanation for the violation or mitigating circumstances. In this case, the absence of any explanation of the violations is particularly troubling because movements were involved. Then a little bit later, the absence of any explanation of their own involvement substantially weighs against setting aside the forfeiture. That's A1444. Let me ask you this question, though. Everything was preceded by proffer. Yes. I know there was the JAD affidavit with documents attached. Right. But the usual bond violation forfeiture case is the person takes off or commits a crime while he or she is released on bond, and the proffer is, you know, we caught him in Idaho, or here's the police report from the Hartford police where he was arrested. And I know the decisions say you can proceed by proffer, but in a situation like this where there was no claim that Brooks had taken off, it was just that the financial parts of the bond were violated, was it appropriate to proceed with such an extensive, document-heavy presentation by the government by proffer only? Yes. And I think there are a couple reasons, but I think the first one is a question of burden. The violation proceeding, which was 2010, preceded by proffer with the JAD affidavit that involved David Brooks' involvement. What's on appeal here is the decision not to return the money in 2015. That proceeded, you know, by briefing. At that point, you know, the government didn't have a burden. The burden was on the appellant to show that the money should be returned to them, and they actually submitted affidavits. They submitted affidavits from David Brooks and Terry Brooks in the district court saying we disclaim ownership of these assets, but they didn't submit any affidavits saying we know there's smoke, there's this series of unfortunate circumstances, you know, that sort of suggest our involvement. They never said they weren't involved. They never submitted anything. And that's what the district court is getting at at the paragraph I read. So, Judge Dronia, I think that's how this all relates. The district court never said I banned the family and the participants from submitting evidence or by presenting some sort of other case. That's different than not having a hearing at all. And she encouraged Jeffrey Brooks to testify, I think, in the two days of the hearing. She may well have, Your Honor. I just don't remember that. I mean, certainly there was a multi-day hearing here. So the idea that there was some kind of due process problem with the way in which the evidence was evaluated, I think, misses the mark. And I think it's the – So my question was – my question is did Jeffrey Brooks ever – his counsel ever come forward and say, yeah, we'd like to tell our side of the story about London and about Switzerland and San Marino and all these other places, but, you know, he has to get prepared. Can we have another week for him to come in? He wants to testify. He's somewhere else. Was there anything like that? I didn't see anything like that in the record. Your Honor, I do not have a total mastery of the record. I have seen nothing like that. I certainly checked for it. I know that Jeffrey Brooks submitted an affidavit in conjunction with the 2015 bail forfeiture issue, which we're talking about now, and he did not say any of those things. He just said, I'm not claiming any of this money. Let me make just – make sure I've discussed everything. Yeah, so then let me just turn quickly, if the Court has no more questions on this point, to the David Brooks abatement argument with respect to the bail forfeiture, which we think is different possibly than the restitution argument. So with respect to the bail forfeiture, just three quick points. First of all, this Court's decision in Aguessy – I may be pronouncing it wrong – certainly involves the case of a defendant who died and the bail was still forfeited. So I think the law is clear that there's no per se abatement of a bail violation as distinguished from some other violation that may turn on the conviction. And I think the reason for that is pretty intuitive. The bail violation is final. You know, the assets were concealed. The person fled. You know, whatever, had someone tampered with the witness. That occurred. In this case, not only did it occur, the revocation of bail was appealed to this Court. This Court affirmed it. So the event occurred. It's over. That's different possibly than a situation in which a conviction, which may have been perfectly valid, has to be invalidated because an appeal is not final. And the final thing is even if the bail forfeiture is viewed as some sort of penalty, which I think the Gambino factor sort of suggests it shouldn't be, you know, the money certainly was already taken. There's a strong general deterrence principle, particularly with bail arguments, that has to be considered here. You know, every time a defendant for whose case I'm responsible for is released on bail, there's a long discussion about how this whole system is set up so that, you know, you don't have to put up any money now because you're going to lose your money if the defendant flees. And the third thing is, as the plaintiffs, excuse me, as the appellants even acknowledge, the violation of the bail, the penalty is almost a liquidated damage provision in a contract. And in this case, it's particularly liquidated damage because there was an agreement that $48 or $45 million of the $400,000 could be taken, but not the whole thing if Mr. Brooks concealed assets. So there was actually a sort of negotiated damage clause in this contract, which was a signed contract, everyone was aware of it, it was final, and it was violated. So for those reasons, the bail forfeiture should not abate. And if the Court has no more questions on that issue, I will turn to my colleague to address the restitution question. Okay, thank you, Mr. Kessler. Ms. Mantel. Thank you. Good morning. I'm Laura Mantel. I'm an Assistant U.S. Attorney in the Eastern District of New York. And what's at issue on this appeal is the statutory right of thousands of victims to finally receive some compensation for the losses and harm that Brooks caused them to suffer over ten years ago. As the Court's aware, even though the defendant was convicted on all counts after a very hard-fought trial that lasted eight months, and even though the District Court ordered him to pay his victims $94 million in restitution, and despite the fact that, unlike in the vast majority of other criminal cases, there's actually enough funds restrained to compensate these victims, Brooks' counsel now asks this Court to absolve Brooks and his estate of all liability for the harm that he caused because the appeal that Brooks filed over three years ago happened to have been pending when he died last October. Let me ask you about that. Aren't there other ways to address the victims' losses than the criminal restitution in this case? And are any of those proceeding now? The best path for recovery for these victims is by upholding this restitution. I didn't ask you for the best path. I asked you for other paths. There is, as the defense refers to in some of its submissions, there are related civil matters. However, pursuing those would impose significant delay. What are they? First, there's a civil forfeiture action that's pending in the District Court. However, what's also pending in that case is a request by the estate, as well as the family members, to dismiss that action. That's currently pending before Judge Seibert. What's also pending is an SEC action in the Southern District of Florida, and again there, the estate has moved to abate significant portions of the SEC's claims in that action. The estate also refers to a private settlement with counsel for the class action and a derivative action suit that was funded with $35 million. Speaking to the attorneys in that case, from what I understand, that money, in fact, was not paid by Brooks, as he states in his letter, but, in fact, was provided pursuant to a D&O policy and was also paid or funded by the company. And, in fact, Brooks has objected to that settlement, and that's currently held up in another appeal that's pending before this court. So despite the fact that we've had 10 years of litigation where the government prevailed at every critical stage, the victims have not received a penny to date, and it's not clear if or when they ever will. Well, it's clear, though, that there would be no restitution if there were no conviction, right? I mean, if he'd been acquitted, we wouldn't be . . . The statute says a convicted defendant shall be required to pay restitution. He has to be convicted. Yes. So how do you separate the restitution from the conviction? That's what the other circuits have done. That's what the third, fourth, and sixth circuits have done, because as this court analyzed the abatement rule in the Wright case and in the Karozovich case, it can be . . . it's a distinct component of the defendant's sentence that's not punitive. It's primarily compensatory in nature. But not all the circuits, right? There's a disagreement. That's correct. But because it's compensatory in nature, the remedy of a restitution judgment, it's based on a victim's loss, not on the defendant's gain. It's assignable. It's inheritable. It's like any other right of a judgment creditor. It's even subject to an offset if a victim gets some form of recovery from a third party. And, in fact, the JNC in this case provides that the restitution order may be converted into a civil judgment. But this notion that because there's no conviction, it's as if all the proceedings never took place, which is being taken to its greatest lengths here by the defense, that's not . . . I'm just thinking of old Pendesto. That's a circuit decision. Yes. It comes out the other way. What's wrong about that decision? Well, the courts in those cases say that it is abatement ab initio, that the conviction, the indictment is dismissed, the conviction is vacated, but, in fact . . . That's what Durham said, right? That's the language from Durham. Durham, but Durham did not address the restitution issue. But these cases in which they have held that abatement applies to restitution, they've never unwound the entire proceedings, so they're not even consistent in the application. So, for example, in the Zizzo case, you had over $100,000 paid in forfeiture and special assessments. In Parsons, the en banc decision, in fact, there was over, I believe, $1 million in forfeiture paid by the defendant. The court, even though it vacated the conviction there and held the restitution abates, it didn't unwind that payment. That payment, the forfeiture, the government kept that, correct? That's my understanding from that decision. Let me just ask you about the tax counts. Is it the government's position that the tax counts restitution should be abated? No. The defendant waived his right to have the restitution. I'm sorry. He waived his right to appeal the restitution. And just to prove this point about the . . . I think their argument is since it's in the same J&C, then that gets the benefit of the abatement doctrine as well. It seems to be their argument. Is that what your understanding is? It appears to be they're saying that all the proceedings are nullified. But the defendant clearly, when he was alive, he waived his right to appeal. And what the abatement doctrine concerns is the right to have your appeal heard, the finality of the conviction. He waived that right. So there's no reason to abate the restitution that was ordered with regard to the tax or as to all the fraud offenses for the reasons that I've explained. And the Third Circuit has had the best solution because if the defendant's really seeking here is to vindicate his right to appeal, the government is prepared, as was done in the Christopher case in the Third Circuit, to have the estate substituted for the defendant so that the appeal can proceed. The defendant already briefed his appeal. It was filed in September after he got many extensions of time. What about Nelson? The defendants' counsel say Nelson solves this problem. The Supreme Court now has ruled recently that the restitution does not abate. What's your view of Nelson? Nelson does not concern the abatement rule. It's not discussed in that decision. Nelson has nothing to do with abatement. Rather, it had to do with the Supreme Court's review of a statute that's called the Compensation for Exonerated Persons. And in that case, the court held that because defendants had their convictions reversed on appeal, they should not be required to file a separate civil action and prove their innocence by clearing convincing evidence in order to recover the monies that they had paid. Well, in fact, in one of the cases, the defendant was retried and acquitted. Isn't that the case? Exactly. And in the second one, the prosecutor decided that they weren't going to go forward. Yes, and those facts make it so distinguishable from what happened here because David Brooks was never exonerated and he certainly was never acquitted of any of the offenses that he was charged with. And in the words of the Supreme Court at the outset of that decision, it says that the decision applies to a conviction that's invalidated by a reviewing court. Here, they're asking for abatement without review. The government will agree to proceed with the appeal by having the estate substituted so that they can get that review. That's really the only interest here that they could be seeking to vindicate, whereas the government here is seeking to vindicate the statutory rights of victims to recover their monies, this obligation that David Brooks was required to pay to his victims. It's mandatory. They've waited more than ten years. The equities here militate overwhelmingly in favor of the victims. It would be a miscarriage. Time's expired. Anything else you wanted to say to wrap up, Ms. Mantel? Just that the victims would suffer all over again if after years of litigation where the government prevailed at every critical stage, this restitution order were to be nullified. And in the words of the court in Christopher, it would provide the estate an undeserved windfall if it were to be refunded the fruits of the defendant's wrongdoing and the defendant could avoid all liability for the losses that he caused. Thank you. Mr. Burstein, you've got some time left. Let me just say one thing on the facts, although I would hope that you would grant Ms. Harris a minute or two to address some things. But nothing has ever been said about Andrew or Elizabeth Brooks other than the fact that copies of their passports were used. So the notion that they should have had to come forward to defend their conduct. Well, my question is, you know, nobody made anybody be a surety here. So you sign a contract. You know what all the terms are. One of the risks of being a surety is that the person that you're the defendant is going to either flee or, in this case, hide assets. Well, we have common ground on that. But one of the other things is that people who become sureties are doing so on the assumption that the defendant is actually charged with a crime. And that's not what happens here. Let's say you come in second on that argument. Let's say that – forget about the indictment for a minute. Let's say if your position is that we should feel sorry for them, they didn't – the government didn't choose to have them be the surety. I'm not – I mean, I think you should feel sorry for them, but that's not what I'm arguing here. What I am arguing here is that they are sureties. They had – they guaranteed appearance when there was no basis to set bail. And had the government actually not innocently or not innocently hidden the fact that there was no valid indictment, bail would have, as a matter of law, been exonerated. Their obligation would have been exonerated. Did you ever ask that? What? Did anybody ever ask Judge Seibert to do that? Well, there was a motion for remission subsequent. Based on this particular – No. Nobody made that. But on the other hand – You say the government hid the indictment, S-1. It was two years later that someone figured out that the term of the grand jury had expired. The government didn't – there's no evidence or even a representation that government knew about that and hid that from the court. Well, that's why I said innocently or not innocently, but the fact of the matter is one could say the government should know when the term of a grand jury expires. But nonetheless, the issue here is the fact that if there – to give you – to answer your question, if there had been a rearrangement and the surety has been asked to appear and they had been – you know, and they agreed to it, you'd be 100 percent correct. Then the invalidity of the first indictment would mean nothing. But that's not what happened here. What happened here – Nobody complained about it. Well, there was nobody even – it just said bail convicted, and nobody learned about this issue. Remember, the forfeiture, the remand was 2010. Nobody learned about this indictment issue until 2012. What you're saying is that what would have happened is that if – because they knew about the second indictment, right? Yeah. So – and nobody said, oh, wait, there's a new indictment. I want to kind of revisit this bail business. Nobody said that, right? Nobody knew that they would have been off the hook in the first instance, that they had no obligation. And again – I think I understand your argument. My point is that it's their obligation, it's speculative to say what my clients would have done as in any surety situation. That's a defense all the time. People come in trying to enforce surety arrangements, and the other side says, well, of course they would have continued to do it. And that's not what the law says. The law says unless there's disclosure, the surety doesn't apply. The only other thing I want to point out is – and this is both with respect to Elizabeth, but also with respect to all of them. Whether or not hardship to – financial hardship to the surety is a factor is almost irrelevant, because Gambino says that the fact that the surety is a family member is a factor to be considered, and particularly the theory being that if they're – you're talking about people who are not in the professional bail bond business, and they should in essence be cut a break for that. Now, if you have somebody – there's proof that there's somebody been involved, and I don't think there is anything, then maybe the family factor has less value. But certainly – We understand that point, Mr. Berkley. Okay. Thank you. We want to hear from – is it Ms. Harris is next, right? That's right. You have some time as well. Thank you, Your Honor. I appreciate the additional courtesy. Your Honor, with respect to the factual issues, what I heard the government attorney essentially say is that, okay, well, maybe there's only involvement in the form of copies of passports being used. But you don't – I don't think that's what he said. Well, I think there is some concession that there's not clear evidence of any knowing involvement by Terry Brooks or the children. And I'm going to address specifically the safe deposit box in a second. But I do want to make clear that there are three different points in the district court opinions below where Judge Seibert cites substantial – that it substantially weighs against setting aside the forfeiture. That was one point. She said it was movements conceded, which we did not, and we cite to the record in our reply brief clearly disputing these allegations, that they helped lay the framework of Sears-Nicot and were aware of that framework, conclusions that are not supported by the record. This is at Special Appendix 9. It's the district court's opinion, Your Honor. And then she said the fact that they're doing so and now invite the court to set aside the forfeiture because they had no role in the utilization of the Sears-Nicot framework. The court declines to countenance such inequity. Clearly the fact that the district court had concluded that Terry Brooks and the children were knowing participants in the Sears-Nicot scheme substantially weighed with respect to how she made an ultimate finding on the remission. Did they ever challenge the video? Your Honor, that video was not cited in the court below. It was a proffer. Let me just finish. The proffer says on the second day of the hearing, this is after the jet affidavit's been presented, with the still photographs of the brother and John Doe 1. The next week, the government comes in with a proffer and says, we also have a video that shows these other two family members involved with that safe deposit box. Did anybody ever say, that's not true, that's not us, show the video, we want to see it, we want the court to look at it? Did anybody ask for that at any time? In 2010, I will say that Brooks' counsel made repeated requests to cross-examine Agent Jett and to have a hearing. What about the video? Did anybody say anything about that, that's not me, I was just getting out some other money for something totally unrelated? Your Honor, frankly, at that point in time, obviously I wasn't involved at that point in time, but at that point in time, the concern was obviously Mr. Brooks' remand, and we weren't at a position where the family was making a motion to set aside the forfeiture. And there's nothing in the forfeiture order language that the judge, on the record in the multi-day hearing that they had in 2010, where the judge makes any reference to the involvement of the family members. The very first time that the family member, the notion, and frankly it was a shock to us at the time, the notion that the family members were somehow complicit, the very first time that comes out, and a record is made of that, is in the district court's opinion denying the motion to set aside the forfeiture. And I do want to just make one thing . . . The offer included that they were there, right? Five years earlier, right, five years . . . That's the day of the real hearing. In 2010. In 2010, I just read it earlier. It did say Victoria and Terry Brooks. Your Honor, and I want to just specifically focus on that point. We went back to the jet affidavit and the exhibit, the exhibits that are attached, which are the photographs from the closed circuit television. The jet affidavit, the conclusion that the jet affidavit is advancing, is that box number 6050 was emptied by Jeffrey Brooks, and that the contents of that box were then placed in box number 6070. That second box, 70, is where the assets were found in violation of the bail order. The box that's associated with Terry Brooks and Victoria Brooks is a different number box. It is box number . . . Two down from the other one, right? 68? Yes, 68. And there's no allegation . . . There's no specific allegation that the contents of that box were placed in the box 6070. And, in fact, Your Honor, the very first time that we're . . . Why do you say that? Because I've got the photo from the London police of the contents of the box that was the subject of the seizure that's got all these Jeffrey Brooks envelopes and letterheads. Again, Your Honor, that is the allegation, that Jeffrey Brooks emptied box 6050 and placed it in 6070. We're not Counselor Jeffrey Brooks. He's not an appellant here. The Terry Brooks and Victoria Brooks box is a different box altogether, and there's nothing in the JET affidavit that suggests that those contents were, in fact, put into box 6070 by John Doe, number one, and in violation of the bail order. And, frankly, the first time that we're really addressing this issue of . . . because it was not a finding made by the district court below. That was not a basis for discounting the Gambino factors, as was the conclusions about the Sears-Nicot and their involvement in Sears-Nicot. The first time we're truly addressing this is, frankly, on appeal, and it's why, if there's not a reversal because of the S-1 issue, is why remand is really necessary so that . . . Thank you. We've got your argument, Ms. Harris. Why don't we hear from Mr. Kluh. You've got some time reserved as well. Thank you. First of all, the notion that there's an appeal waiver in this case and that we couldn't proceed is going . . . that's really going beyond saying, well, we want to withdraw our concession that the convictions have to be vacated. That's really going . . . taking it to a new level. When you respond to a motion for abatement saying, yeah, we agree the tax convictions have to be abated, and then you come into the Court of Appeals and say, oh, no, we should have filed a motion to dismiss the appeal. That's really . . . that's beyond. And then you add the conversations, the conversations that I hear about today that, well, maybe not all of the $36 million came directly from David Brooks. The $36 million that has already been given to the victims, that has . . . was only given to them by David Brooks' action, affirmative action, making sure that they got that money that they could get. And that also is no reason to say, well, just don't apply Nelson here. And the notion that, well, they weren't exonerated here? What do you think the Exoneration Act was about? Let me ask you something else. They don't have to be exonerated. Let me ask you something else, though. You know, the government makes a point about the policy here, that if we rule in your favor, that the money goes right back to the family. And do you see that there is something that seems not quite right about that, where because of this one circumstance, all of the money that we're talking about, where the government has prevailed at every level, that it goes right back to the family? I'm going to answer that question the way I think Justice Ginsburg answered it. When she's talking about a child rapist . . . But he got acquitted. He did not get acquitted. They couldn't proceed. They decided he won on 20 . . . But there was a finding, a determination by the prosecutors. It's a different case. I understand. And so the policy question that I have for you, this is not that case. There's no statute. And there's been no affirmative finding, either by a jury or by the prosecutor, that they're not going to proceed. This is a much different case. So my question for you is, one of the opinions that we've been thinking about, that we've been talking about, talks about that restitution is a complete . . . It's neither fish nor fowl. It's not purely punitive, and it's not purely recompensing the victims. So what would be so bad about having the estate stand in for the defendant? Because the estate is the one who wants the money. So what's wrong with that argument? Why don't we treat it as something that is neither fish nor fowl, and in this situation, have the appeal proceed just as you are today, standing up for the estate? Your Honor, the short answer is because we all, everybody in this room, lives and breathes by the rule of law. Well, I get that. You don't have to tell me that. I understand that. But I'm asking you why . . . That's the policy. That's the policy that trumps . . . I want people who I think are victims, even though the Supreme Court says, no, you have to presume when somebody's conviction is vacated, they're innocent. So we have the policy of the rule of law first. The second policy we have is the policy of the presumption of innocence by which we all are able to walk down the street. And that means if I'm not convicted, if I walk out of this court, if I'm David Brooks, I walk out of this court, he can't. And I'm not convicted for whatever reason. The transcripts weren't prepared. The prosecutor forgot to show up for oral argument for whatever reason. Nobody can ever point their finger at me and say, you owe somebody some money because you're a criminal. They can never do that. And that is so fundamental. That trumps every possible policy. But if you wanted to get to the policies, there is no reported case, not on our side, not on their side, where there is so much litigation that is protecting these victims. They've already gotten $36 million by voluntary action of this defendant. There's SEC action draining the estate in Miami. There's a civil forfeiture action that they've gone on about. $170 million is restrained. None of those other cases are talking about restrained money. The money is not going anywhere until these cases are decided. What is their argument? Well, but those courts are going to abate the penalties. Is that the argument? That you can, because courts are going to say, yes, of course, you have to abate penalties in a civil case, that you shouldn't abate penalties in a criminal case? Is that their argument? That's ridiculous. First of all, everybody files motions to dismiss. There's no motion to dismiss filed in the class action case. There's no motion to dismiss filed in the derivative case. And they are not seeking to withdraw their restitution agreement. They're not seeking to withdraw their settlement. They're happy with the settlement anyway. They've put that in their briefs. I don't know what they told her in the conversation. In their briefs, in 15-2932, they said, we're happy either way, no matter what this court does in restitution, because that way we get our extra $36 million. Thanks. We'll reserve decision on this case. Thank you for your arguments. The other three cases that we have on our calendar for today are under submission, so I'll ask the clerk to adjourn court at this time.